**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ANTHONY HARRIS,

    **Plaintiff,**

    **v.**                                 **Civil Action No. 12-1453 (JEB)**

**DISTRICT OF COLUMBIA WATER
AND SEWER AUTHORITY,**

    **Defendant.**

## MEMORANDUM OPINION

The poet Kahlil Gibran once wrote, "In one drop of water are found all the secrets of the oceans."  In this case, Plaintiff Anthony Harris contends that in sending one or two letters of complaint, he has exposed the secret and improper personnel practices of the District of Columbia Water and Sewer Authority, his former employer and the Defendant here.  Such disclosure, he believes, precipitated his termination, in violation of both federal and D.C. law – namely, Title VII, 42 U.S.C. § 1981, the D.C. Whistleblower Protection Act, the D.C. Family and Medical Leave Act, and the common law of wrongful discharge.

Plaintiff's federal claims were dismissed in earlier stages of this litigation, and Defendant now moves for summary judgment on the remaining state causes of action.  WASA maintains that Plaintiff was terminated for innocent and legitimate reasons and that he never even took family or medical leave.  Agreeing with Defendant on both counts, the Court will grant its Motion and enter judgment on these two causes of action.  Only Harris's wrongful-termination claim stems the tide of WASA's argument.

1

I.     **Background**

A.   <u>Facts</u>

Although courts consider the facts in the light most favorable to non-movants on motions

for summary judgment, here there is no dispute as to the basic underlying events.  WASA

employed Harris as a Systems Operations Manager at the time our narrative unfolds.  <u>See</u> Mot.,

Attach. 2 (Statement of Material Facts Not in Dispute (SMF)), ¶ 1; Pl. Resp. to SMF, ¶ 1.  He

was responsible for, among other things, managing WASA's computerized Maintenance

Management System, known to agency employees as "Maximo."  <u>See</u> Mot., Attach. 3

(Declaration of Arthur R. Green, Jr.), Exh. 1 (Job Description).

In a January 2009 memo titled "Eliminated Positions," WASA identified Plaintiff's

position as one of several that "may be affected" during the upcoming fiscal year "due to

technolog[ical] enhancements and realignment of functions."  Green Decl., Exh. 2

(Memorandum of Jan. 30, 2009) at 1.  As it turned out, the Systems Operation Manager position

was not eliminated that fiscal year, though the agency continued to designate it as a candidate for

elimination in intra-agency correspondence concerning "Projected Eliminated Positions [for]

Department of Maintenance Service" for fiscal years 2010 and 2011.  <u>See</u> Green Decl., Exh. 3

(Memorandum of Jan. 22, 2010), <u>id.</u>, Exh. 4 (Memorandum of Jan. 27, 2011).  Harris

nonetheless remained employed as Systems Operations Manager at the time each of these

memoranda was written.

In early 2011, he sent letters to D.C. Mayor Vincent Gray and City Councilmember

Harry Thomas, Jr. complaining of fraud, waste, and abuse at WASA.  <u>See</u> SMF, ¶ 6; Pl. Resp. to

SMF, ¶ 6.  In his paragraph-long letter to the Mayor – sent as an email bearing the subject

heading "Economic Development" – Harris posed a series of "questions that pertain to jobs for

citizens of the District" at WASA.  See Opp., Attach. 8 (Jan. 12, 2011, Email from Plaintiff to

Mayor Gray).  He asked why "there are no DC residents able to participate in the flow of

economical [*sic*] advancement" driven by "[o]ne of the most lucrative and profitable venues in

the city . . . the Water and Wastewater facilities."  Id.  He also asked why "the current

management team at DCWater displaced the current workforce" and suggested that the Mayor

"should investigate the activities" of WASA management.  Id.  Plaintiff later explained that these

complaints were based on the statements of other employees and on his own views about

WASA's compensation and hiring practices.  See SMF, ¶ 17; Mot., Attach. 4 (Declaration of

Jocelyn R. Cuttino), Exh. 7 (Deposition of Anthony Harris) at 72:3-11.  Harris was contacted by

WASA to schedule a meeting to discuss the issues he raised in his email to the Mayor, but the

agency later canceled their appointment and such a meeting never occurred.  See Harris Dep. at

24:10-21.

In February 2011, Harris also sent a letter via courier to Councilmember Thomas,

complaining that new hires at WASA were underqualified for their positions and that

independent contractors were being hired improperly from other states.  See Cuttino Decl., Exh.

8 (Letter from Plaintiff to Harry Thomas, Jr.).  Rather than posing questions to Thomas, Plaintiff

complained directly of "poor employment practices" and "nearly criminal acts that are

happening."  Id. at 1.  Although the substance of his complaints to Thomas mirrored the concerns

raised in his email to the Mayor, Harris stated them with greater clarity in the three-page letter,

citing examples of employee terminations he believed were improper and detailing other

"irrational moves" WASA management had made.  Id. at 1-3.

Eight months later, on October 6, 2011, Plaintiff took a few days' leave, designating it as

"annual leave" on his leave request form.  See SMF, ¶ 10; Pl. Resp. to SMF, ¶ 10.  On October

13, while Harris was still on leave, WASA sent him a notice informing him that his position was being abolished through a reduction in force (RIF) and that he would be terminated effective November 14. See Green Decl., Exh. 6 (RIF Notice). Harris was, indeed, terminated on that date. See Pl. SMF, ¶ 106.

B. Procedural History

Plaintiff filed this suit in September of 2012, raising claims of common-law wrongful termination, as well as violations of the D.C. Whistleblower Protection Act, Title VII, 42 U.S.C. § 1981, and the D.C. Family and Medical Leave Act. See ECF No. 1 (Complaint). Shortly thereafter, Defendant moved to dismiss the Complaint. See ECF No. 6. In what became a recurrent practice of missed deadlines throughout this litigation, Harris failed to timely file an opposition to that motion to dismiss, so the Court granted the motion as conceded; later, after Harris explained his failure to file, the Court granted his motion for reconsideration. See ECF Nos. 8, 9, 12. Once it was fully briefed, the Court again granted Defendant's motion to dismiss, this time on the merits. See ECF No. 16 (MTD Order). The Court ruled that Plaintiff had not sufficiently pled causation under Title VII or Section 1981, and it declined to exercise supplemental jurisdiction over his remaining state-law claims. See ECF No. 17 (MTD Opinion) at 1. Harris appealed, and the D.C. Circuit reversed, holding that Plaintiff's allegations could meet the causation requirements of his federal claims. See Harris v. D.C. Water and Sewer Auth., 791 F.3d 65 (D.C. Cir. 2015).

On remand, the parties informed the Court that parallel litigation on Harris's state-law claims had been ongoing in the D.C. Superior Court, and that substantial discovery had been completed there. (Harris never explained why he had filed essentially the same case in both federal and state court.) As a result, the Court held the state-law claims in abeyance pending the

4

parties' decision on how to proceed in the Superior Court litigation.  See Minute Order of September 2, 2015.  WASA then moved for summary judgment on the Title VII and Section 1981 claims only.  See ECF No. 24.  When Harris once more failed to oppose Defendant's motion, despite an extension of time, the Court granted it as conceded and entered judgment for WASA on the federal claims.  See Minute Order of November 16, 2015.

Next, at a status conference, the parties agreed that they would like to proceed on the state-law claims before this Court.  The Court acquiesced and permitted deposition testimony, affidavits, and declarations from the related Superior Court proceedings to be submitted as evidence in the parties' briefing here.  See Minute Order of November 30, 2015.  WASA then moved for summary judgment on the remaining state-law claims, and Harris actually filed an opposition this time.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P.

56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III.   Analysis

Before proceeding to the merits of the remaining state-law claims, the Court must first address two preliminary matters: whether it may exercise supplemental jurisdiction over those claims, and what is to become of the sole state-law cause of action not mentioned in either party's briefs here.  After passing through those antechambers, the Court then enters the main hall of the parties' briefing – *viz*, the disputes over the D.C. WPA and FMLA claims.

### A.  Supplemental Jurisdiction

As previously explained, although Plaintiff originally sought relief for violations of both federal and state law, the former have since been dismissed, leaving only common-law wrongful discharge and violations of D.C.'s WPA and FMLA.  See Compl., ¶¶ 35, 41.  While this would

6

typically divest the Court of jurisdiction, it may nevertheless exercise supplemental jurisdiction over the state-law causes of action pursuant to 28 U.S.C. § 1367.

Federal district courts are given supplemental (or "pendent") jurisdiction over state claims that "form part of the same case or controversy" as federal claims over which they have original jurisdiction.  See 28 U.S.C. § 1367(a); see also Atchinson v. District of Columbia, 73 F.3d 418, 424 (D.C. Cir. 1996) ("The federal statute providing for supplemental jurisdiction over state-law claims allows a federal district court to retain supplemental jurisdiction over state-law claims even after dismissing all claims over which it has original jurisdiction.").  By the same token, federal courts "may decline to exercise supplemental jurisdiction over [such] claim[s] . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. § 1367(c)(3).  The decision of whether to exercise supplemental jurisdiction where a court has dismissed all federal claims is left to the court's discretion as "pendent jurisdiction is a doctrine of discretion, not a plaintiff's right."  United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966), quoted in Shekoyan v. Sibley Int'l, 409 F.3d 414, 423 (D.C. Cir. 2005).  When deciding whether to exercise supplemental jurisdiction over state claims, federal courts should consider "judicial economy, convenience, fairness, and comity."  Shekoyan, 409 F.3d at 424.

Here, these factors weigh in favor of retention of the case.  First, the suit was filed in 2012, and during the intervening years, the Court has developed significant familiarity with the facts and legal issues presented.  See Schuler v. PricewaterhouseCoopers, LLP, 595 F.3d 370, 378 (D.C. Cir. 2010) (finding that district court appropriately retained pendent jurisdiction over state claims where it had "invested time and resources" in case).  Second, the remaining state-law claims do not involve "unsettled issues of state law" or legal questions "that have never been

addressed by the District of Columbia courts." <u>Fin. Gen. Bankshares, Inc. v. Metzger</u>, 680 F.2d 768, 776-77 (D.C. Cir. 1982).  Rather, they involve well-settled standards and statutes well known to this Court.  Finally, the parties themselves assented to the Court's exercise of pendent jurisdiction over the state causes of action at a status conference.  <u>See</u> ECF No. 28 (Order of Nov. 30, 2015).  As the Court can conceive of no undue inconvenience or unfairness to the litigants that would result from its adjudication of the claims arising under the laws of the District, it will exercise supplemental jurisdiction over Plaintiff's non-federal causes of action.

B.  <u>Count I: Common-Law Wrongful Discharge</u>

Before analyzing the counts on which WASA has moved for summary judgment, the Court must first pause to address the sole claim on which WASA has not so moved – *i.e.*, wrongful discharge.  Plaintiff's inartful pleading may have contributed to the confusion.  Instead of breaking out his claims in separate counts, Harris has lumped some together.  For example, in Count I, he pleads both wrongful discharge and a violation of the DCWPA.  <u>See</u> Compl., ¶¶ 32-35.  In moving for summary judgment, WASA may have overlooked this grouping of claims; indeed, its Motion is not styled as a request for <u>partial</u> summary judgment.  Curiously, Harris himself makes no mention in his briefing of his wrongful-termination cause of action.  Notwithstanding its absence from his Opposition, the Court presumes that Plaintiff intends to proceed with this claim, as he has not elsewhere indicated a desire to voluntarily dismiss it.  As WASA has not moved for summary judgment on wrongful discharge, the Court cannot *sua sponte* dispose of that claim.  It will thus consider WASA's Motion only as to the DCWPA and DCFMLA causes of action.

C.  Count I: D.C. Whistleblower Protection Act

Getting to the heart of the matter, the Court now turns to Harris's state whistleblower claim.  The DCWPA, like its federal equivalent, is intended "to encourage disclosure of wrongdoing to persons who may be in a position to act to remedy it."  Wilburn v. District of Columbia, 957 A.2d 921, 925 (D.C. 2008) (quotation marks, citation, and emphasis omitted). The Act permits District employees to "function as the 'eyes and ears' of District taxpayers" without fear of retribution.  Williams v. District of Columbia, 9 A.3d 484, 490 (D.C. 2010) (citation omitted).  It provides that a "supervisor shall not take, or threaten to take, a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure."  D.C. Code. § 1-615.53(a).

To state a *prima facie* claim under the DCWPA, a plaintiff must "establish[] that she made a protected disclosure, that a supervisor retaliated or took or threatened to take a prohibited personnel action against her, and that her protected disclosure was a contributing factor to the retaliation or prohibited personnel action."  Wilburn, 957 A.2d at 924.  If a plaintiff establishes these three elements, "[t]he burden then shifts to the defendant to show by clear and convincing evidence that the adverse employment act would have taken place even if plaintiff had not engaged in protected activity."  Winder v. Erste, 905 F. Supp. 2d 19, 33 (D.D.C. 2012) (quotation marks and citation omitted).  If the defendant makes such a showing, the burden then shifts back to the plaintiff to demonstrate that the explanation was pretextual.  See id.

Harris contends that his letters to the Mayor and Councilmember Thomas were efforts to "report[] the suspected illegal and fraudulent and wasteful acts perpetrated by WASA" and hence constitute protected activity; he further believes that this activity is the reason WASA terminated him.  See Opp. at 25-29.  Defendant rejoins that Harris's letters do not constitute "protected

disclosures" under the DCWPA, and, even if they did, he has failed to establish that they caused

his termination.  See Mot. at 7-12.  The Court addresses each of these elements separately.

### 1.  *Protected Disclosure*

Under the DCWPA, a protected disclosure

> means any disclosure of information, not specifically prohibited by
> statute, without restriction to time, place, form, motive, context,
> forum, or prior disclosure made to any person by an employee or
> applicant, including a disclosure made in the ordinary course of an
> employee's duties by an employee to a supervisor or a public body
> that the employee reasonably believes evinces
>   A.  Gross mismanagement;
>   B.  Gross misuse or waste of public resources or funds;
>   C.  Abuse of authority in connection with the administration
>       of a public program or the execution of a public contract;
>   D.  A violation of federal, state, or local law, rule, or
>       regulation, or of a term of a contract . . . or
>   E.  A substantial and specific danger to the public health and
>       safety.

D.C. Code § 1-615.52(a)(6).  "The eligibility of a disclosure for protection under the DCWPA

thus hinges not upon whether the" conduct of the D.C. government agency "was ultimately

determined to be illegal, but whether appellant reasonably believed it was illegal" or constituted

gross misconduct, abuse, fraud, or waste.  See Freeman v. District of Columbia, 60 A.3d 1131,

1141 (D.C. 2012) (quotation marks and citation omitted).  An employee's "reasonable belief

turns on whether a disinterested observer with knowledge of the essential facts known to and

readily ascertainable by the employee could reasonably conclude that the actions of the

government evidence illegality, gross abuse, etc." Saint-Jean v. District of Columbia, 846 F.

Supp. 2d 247, 260 (D.D.C. 2012) (quotation marks, citation, and alterations omitted).  "A purely

subjective perspective of an employee is not sufficient even if shared by other employees."

Zirkle v. District of Columbia, 830 A.2d 1250, 1260 (D.C. 2003) (citation omitted).

For Harris's actions – here, his letters to former Mayor Gray and former Councilmember Thomas – to constitute protected disclosures, he must demonstrate that the facts known to him at the time he sent these missives would reasonably have led a disinterested observer to conclude that WASA was engaging in gross mismanagement or the like.  In assessing whether Harris made protected disclosures, the Court considers the complaints raised in the letters themselves. Plaintiff's deposition testimony is also instructive as to his motivations for writing the two letters and the bases – or, more often than not, lack thereof – of his suspicions about WASA's alleged misconduct.

In his letters, Harris raised three complaints: that WASA replaced qualified employees with unqualified ones; that it improperly hired and used contractors; and that it disproportionately fired black employees.  The Court will dip into each stream of arguments in turn.

### a.   Replacement of Qualified Employees

The predominant complaint in Harris's letters was that WASA hired unqualified individuals – and, in particular, replaced qualified employees with less-qualified successors. See, e.g., Thomas Letter at 1 (complaining that WASA's "new regime was dispensing with qualified individuals for no more reasoning [*sic*] than they had a position that was 'at will' and the new regime had someone in mind to fill the position. . . [who] have [*sic*] not proven to be qualified to fill the positions."); see also Gray Email ("Why has the current management team at DCWater displaced the current workforce. . .?").  He later explained that he had reached out to city officials because he believed that "the regulations were being ignored, . . . [and] there were people being dismissed only because they, you know, could not perform because there was no

standard to perform to." Harris Dep. at 23:2-17.  Construing these liberally, Plaintiff appears to

complain of regulatory violations and gross mismanagement in his letters.

As to the former, however, Plaintiff testified that he did not know which regulations, if

any, governed how a position could be filled at WASA.  See SMF, ¶ 21; Harris Dep. at 61:13-20;

Pl. Resp. to SMF, ¶ 21.  From the get-go, then, the Court is skeptical that Plaintiff could form an

objectively reasonable belief that any relevant regulations were being violated.

As to the latter, Harris admitted in his deposition that he did not have knowledge of the

facts and circumstances surrounding the terminations of the employees he believed should not

have been fired.  See, e.g., Harris Dep. at 44:19-21.  For instance, Harris's letter to Thomas

complained that "it appears fraudulent [for WASA] to have released" Gordon Fry, Barbara

Greer, and Everett Lallis for "not being on board with the new direction" when, Harris states,

"there is no new direction."  Thomas Letter at 2.  But in his deposition Harris acknowledged that

he had never seen former Safety Director Everett Lallis's CV and was simply "pretty sure he was

very well qualified."  SMF, ¶ 22; Pl. Resp. to SMF, ¶ 22; Harris Dep. at 42:19-22.  Plaintiff also

admitted that he was "not totally aware of why [Lallis] was let go" – beyond hearing that union

leaders were unhappy with him – and was not familiar with the qualifications of Lallis's

replacement.  See SMF, ¶¶ 23-25; Pl. Resp. to SMF, ¶¶ 23-25; Harris Dep. at 44:7-11, 47:2-21;

see also id. at 46:19-21 (answering in the negative the question whether Harris had any reason to

believe Greer's successor is less qualified than Greer).

These types of admissions suggest that Plaintiff had, at most, a subjective belief of

misconduct in WASA's hiring practices – not an objective one, as required by the statute.  Harris

does not marshal any other facts or evidence to which he had access that could have supported a

reasonable belief that WASA was firing qualified employees and replacing them with

unqualified ones – or that such a practice violated any relevant laws or regulations.  See
Rodriguez v. District of Columbia, 124 A.3d 134, 142-43 (D.C. 2015) (granting summary
judgment to employer on DCWPA claim where plaintiff's protected disclosures at most evinced
a "subjective belief" that employer's actions "would jeopardize [its] ability to accomplish its
mission," but such actions were within employer's discretion and supported by objectively
legitimate reasons); see also Thomas Letter at 1 (suggesting that Plaintiff's letter will "assist[]
[WASA] in its efforts to accomplish its stated mission").

　　　　Rather, soaked in hyperbole as they are, Harris's letters seem to have "merely giv[en] his
opinion on a policy issue" – i.e., the new direction of WASA's management and attendant
personnel decisions.  See Hawkins v. Boone, 786 F. Supp. 2d 328, 334 (D.D.C. 2011) (holding
that "entering a debate about a controversial issue" did not constitute protected disclosure).
Harris may not have applauded WASA's personnel decisions, but a simple disagreement
between a District employer and employee does not supply the latter with a DCWPA claim.  See
Zirkle, 830 A.2d at 1260 ("The WPA is not a weapon in arguments over policy. . . .") (citation
omitted); District of Columbia v. Poindexter, 104 A.3d 848, 855 (D.C. 2014) ("[D]ebatable
differences of opinion concerning policy matters are not protected disclosures.  Rather, for a
lawful agency policy to constitute 'gross mismanagement,' an employee must disclose such
serious errors by the agency that a conclusion the agency erred is not debatable among
reasonable people.  The matter must also be significant.") (quotation marks and citation omitted).

　　　　The Court, therefore, concludes that "a reasonable juror with knowledge of the essential
facts known to and readily ascertainable by" Plaintiff could not find that his letters "disclosed an
objectively serious governmental act of gross mismanagement."  Coleman v. District of
Columbia, 794 F.3d 49, 58 (D.C. Cir. 2015) (quotation marks and citation omitted).  The

undisputed record evidence instead dictates the conclusion that Harris's complaints to the city about the purported firing of qualified persons and the hiring of unqualified candidates were not "protected disclosures" within the meaning of the statute.

b.   Independent Contractors

The second issue Harris raised in his letters was that WASA hired and used independent contractors improperly.  See Thomas Letter at 2 (asserting that "[b]illions of dollars of District of Columbia rate payers' money [is] being spent" on contracts "with little if any positive social economic return to the DC community"); Harris Dep. at 23:2-7 (testifying that Harris told the Mayor in his letter that "DC residents and employees [were] being displaced in their job and . . . being replaced with out-of-town contractors").  WASA rejoins that Harris had no involvement with the hiring of contractors and thus could not have been familiar with the agency's contracting procedures.   See Mot. at 10.  It also points out that Harris has not identified any documentation corroborating his belief that out-of-town, rather than local D.C., contractors were hired – or that, even if such hiring did occur, it violated any extant laws or regulations.  See id.

Harris makes no real effort to rebut these contentions.  On the contrary, he testified that he "ha[d] no idea" which contractors were hired from out of state but knew only that "there were so many contractors coming in at the time" and some of them had out-of-state license plates on their cars.  See Harris Dep. at 79:17-22, 80:1-19.  Perhaps most telling, when asked whether there was a regulation that required that those contractors come from the D.C. area, Plaintiff answered in the negative and admitted it was just his view that "some" of the new contractors should hail from the region.  See id. at 81:8-15.  The only policy he points to that may lend support to that view is WASA's general efforts to hire local businesses with its contract dollars.  Yet he presents the Court with a letter sent by a WASA official to Mayor Gray, apparently in a

14

follow-up to Harris's email, in which the agency explained that approximately 57% of WASA's

contracts in fiscal year 2009 were awarded to District-based firms and small business enterprises

– in excess of WASA's 50% goal for spending discretionary dollars with local businesses.  See

Opp., Attach. 10 (Feb. 1, 2010, Letter from Katrina Wiggins to Vincent Gray) at 1.

      Harris attempts to muster factual support by citing to a public website that, he contends,

confirms his belief in WASA's contracting improprieties.  See Opp. at 27.  Yet the publicly

available WASA budgets posted on that website offer no information about the agency's

practices for awarding independent contracts, how those practices are constrained by regulation,

or the impact of WASA's contracts on the D.C. community.  See, e.g., FY 2009 DC Water

Budget in Brief, available at http://www.dcwater.com/budget (last visited Mar. 11, 2016, at 4:38

p.m.).  In any event, Harris does not aver that he visited this site before writing the letters he now

contends are protected disclosures.  Even if he had, insofar as the basis for Harris's belief in

WASA's misconduct is publicly available information, then the activities – even if improper –

were "already broadly known [such that] they could not be protected disclosures."  Tabb v.

District of Columbia, 605 F. Supp. 2d 89, 98 (D.D.C. 2009).

      What seems to motivate Harris's objection to WASA's use of contractors is his

conviction – buttressed by at least one of the agency's employees – that some terminated

employees' duties (including his own) are now being performed by new contract employees.

See Opp. at 27; id., Exh. B (Declaration of Timothy M. Morsell, Sr.) (averring that four contract

employees and one WASA employee now perform Harris's former duties).  Of course, this does

not mean that WASA's actions were or could reasonably have been perceived to be illegal or to

constitute gross mismanagement.  See Mentzer v. Lanier, 677 F. Supp. 2d 242, 250 (D.D.C.

2010) ("[G]ross mismanagement requires that a claimed agency error in the adoption of, or

continued adherence to, a policy be a matter that is not debatable among reasonable people.")
(quotation marks and citation omitted).  Nothing in the record indicates that WASA's shuffling
of responsibilities among new and old employees, and among independent contractors, was
inappropriate, fraudulent, or wasteful.  In fact, Harris admits that WASA's IT department could
not have implemented key improvements to Maximo, the agency's computerized management
system, without the help of contractors – suggesting that even he recognizes that WASA's use of
contractors was both necessary and proper.  See Harris Dep. at 110:12-15.  The undisputed facts
thus again demonstrate that Harris had no objective basis for his belief that WASA's hiring of
independent contractors constituted gross mismanagement.

c.   Firing of Black Employees

Harris's third and final complaint is that WASA disproportionately fired black
employees.  To begin, there is a threshold question about whether he even sufficiently
complained of this in his letters.  The allegation is completely absent from his lengthy missive to
Councilmember Thomas; there, his concerns were about terminated employees' qualifications
and places of residence, not their races.  The Court acknowledges, however, that Harris at least
rhetorically posed the question in his brief email to Mayor Gray.  See Gray Email (asking why
"the current management team at DCWater displaced the current workforce (most were African-
American) . . . .[and] dismiss[ed] any and nearly all African-American Directors/Managers
[sic] who would have the power affect [sic] budgeting (money) or hiring (personnel)?").  The
reader will recall, however, that the title of the email was "Economic Development," and it is
clear that this is the focus of the message: it opens with a question about contracting practices
that Harris believes have hurt D.C. residents and ends with his suggestion that the Mayor
investigate WASA's practices which, he alleges, leave its local constituents "socially and

economically distute [*sic*]." Id.  While he now seeks to recast those concerns in a new light, his DCWPA claim must rest on the purportedly protected disclosures at the time they were made. See Bowyer v. District of Columbia, 910 F. Supp. 2d 173, 195 (D.D.C. 2012) ("The basis for determining the nature of charges that a putative whistleblower has made are the statements in his complaint to a supervisor or public body, not his subsequent characterization of those statements in litigation.") (quotation marks, citation, and alterations omitted).

Even if Harris had directly complained in his letters of race-based discrimination by WASA, those complaints would only be protected disclosures if he had an objectively reasonable basis for them.  To that end, Plaintiff insists that he "had been at WASA for so long . . . [that he was] in a position to see the changing demographics at WASA" caused by, he believes, "WASA's use of contractors to force out long-time employees, especially Black employees." Opp. at 27.  While Harris's history with the agency might have afforded him a unique perspective, he never proffers any facts or evidence that could have supported a reasonable belief that the demographics at WASA did change, and that such changes were the result of illegal activity or gross mismanagement.  In other words, even if Harris was in a good position to spot racially discriminatory personnel practices, the record does not reflect that any such practices were occurring.

Harris testified that he was aware of black employees who were replaced by whites, and this led him to "question whether or not the practices" and "circumstances" under which WASA removed them "may not be racially motivated."  Harris Dep. at 115:2-19.  Pressed to identify these black employees, however, Harris could name only "Lallis, Greer, Thorne" and "[t]he James guy."  Harris Dep. at 115:9-16.  (Later, he acknowledged that Greer was actually replaced by another black employee.  Id. at 116:1-2.)  Harris never argues that the employees he named

were targeted for termination because of their race, or that there were not other, non-black employees who were terminated.  Beyond this anecdotal evidence that a handful of black employees were replaced by white ones, moreover, Harris identifies nothing in the record that would suggest to an objective observer that WASA was acting in discriminatory fashion.  In fact, the evidence he submits suggests just the opposite:  WASA's Assistant General Manager reported that "the percentage of minority officials and administrators" at WASA "has <u>increased</u> by 2% since June 2009 [and i]n general, the representation of minorities enterprise-wide has remained relatively constant since 2009." Wiggins Letter at 2; <u>see also</u> <u>id.</u> ("The charge that [WASA] has dismissed nearly all African-American directors and managers who would have the power to affect budgeting and hiring is inaccurate. . . [Of the p]ersonnel changes . . . none have negatively impacted the African-American population. . . .").

Ultimately, what prevents Harris's letters from acting as the protected disclosures he would like them to be is his failure to provide an objectively reasonable basis for the concerns he raises therein.  Without identifying grounds for his complaints beyond his personal dissatisfaction with the "nearly tyrannical rule" of WASA's management, Harris cannot hope to anchor a DCWPA claim to his letters.  <u>See</u> Thomas Letter at 3.  With no jury question on the issue of protected disclosure, consequently, WASA may obtain entry of judgment on this count.

2. *Causation*

Even if Plaintiff's communications to the Mayor and Councilmember did constitute protected disclosures, WASA argues that it would still be entitled to summary judgment on his DCWPA claim.  In doing so, Defendant advances the alternative and independent argument that Harris cannot establish that those protected disclosures <u>caused</u> the adverse employment action – here, his termination.  The D.C. Court of Appeals has explained that "[c]ausation is all-

important, because while an employee makes a *prima facie* case by showing that the protected disclosure was a contributing factor to the disciplinary action, a [fact-finder] must find a <u>direct causal link</u> in order for there to be liability" under the DCWPA. <u>Johnson v. District of Columbia</u>, 935 A.2d 1113, 1119 (D.C. 2007) (quotation marks and citation omitted). The causation element is "consistent with the policy that a whistleblower statute shields an employee only to the extent the record supports a finding that he would not have been disciplined except for his status as a whistleblower." <u>Crawford v. District of Columbia</u>, 891 A.2d 216, 222 (D.C. 2006) (quotation marks and citation omitted). Importantly, "mere suspicion coupled with mere possibility is not evidence of causation." <u>Johnson</u>, 935 A2d. at 1120.

According to Plaintiff, he was terminated for writing letters exposing WASA's waste, fraud, and abuse; that, after all, is the gravamen of his DCWPA claim. When asked during his deposition <u>why</u> he believed in this alleged connection between his termination and the complaints he had voiced, Harris responded: "I believe that it was too coincidental that I had a RIF telling me that I was – my position was a reduction in force." Harris Dep. at 127:6-11. He explained that because his position was not "at will," he could be fired only for cause, and so "they come up with this one person RIF . . . . So yes, I made the assumption that it had been because" of his letters. <u>See id.</u> at 127:15-22, 128:1-6; <u>see also id.</u> at 138:20-139:3 (answering "No" when asked, "[O]ther than what you thought was a coincidence of being on the RIF list, is there any other reason you believe your termination was connected to your complaints to the mayor and city council?").

In moving for summary judgment, Defendant argues that aside from Harris's murky suspicions of a "coincidence," there is no evidence that he was terminated because of his two letters. <u>See</u> Mot. at 12. The Court concurs. To begin, Harris testified that no one at WASA ever

told him he was being terminated because of his complaint letters, and that he never saw or heard

any communications to that effect.  <u>See</u> Harris Dep. at 131:4-10.  There is thus no direct

evidence of causation.

Nor is there circumstantial evidence of a causal link.  The record demonstrates that

Harris's position was identified for elimination via a reduction in force in January 2009, two

years <u>prior</u> to his complaint letters.  <u>See</u> Memorandum of Jan. 30, 2009 (identifying fifteen

positions for elimination, including Plaintiff's).  To the extent he might argue that the RIF was

effectuated only after his complaints – and only against him – he is wrong.  Plaintiff was not the

victim of a "one-person RIF"; in fact, he later acknowledged that WASA terminated others,

including his supervisor and director, on the same day that he was let go.  <u>See</u> Harris Dep. at

131:12-21 ("[E]verybody was being replaced on that particular day.  My supervisor and my

director were all being replaced.");  <u>see also</u> Opp., Attach. 24 (Declaration of Warren McHenry),

¶¶ 2-8 (stating that he was Harris's immediate supervisor; that he was notified that his "position

was being abolished" on October 13, 2011; and that McHenry's immediate supervisor "had been

summarily terminated in the same way that [he] had been terminated" on the same day); Cuttino

Decl., Exh. 10 (Deposition of Arthur Richard Green, Jr.) at 35:8-13 (explaining that RIFs

occurred because of "technology and reassignment of work duties").

Nor is this a case where temporal proximity between protected disclosures and

termination muddies the waters.  Eight months passed between the later of Harris's letters in

February 2011 and his receipt of notice of his termination in October 2011 – too much time to

raise the specter of causation.  <u>See</u> <u>Johnson</u>, 935 A.2d at 1120 (holding that four-month lag

between protected disclosures and adverse employment action was too long to permit an

inference of causation); <u>cf.</u> <u>Taylor v. Solis</u>, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (two- to three-

month lag between protected activity and adverse employment action was too long to establish

an inference of retaliatory motive in Title VII context).  Even when an employee suffers an

adverse employment action very shortly after his protected disclosures, such temporal proximity

alone cannot establish causation where there is also "explicit evidence of an innocent explanation

of the event." Johnson, 935 A.2d at 1120.  Here, Defendant has consistently proffered a

reasonable explanation for Harris's reduction in force: his duties were rendered obsolete or

redundant by advancements in the agency's computerized management system (Maximo), and

his department was, therefore, substantially downsized.

In light of the eight-month time lapse between the purported protected disclosures and the

termination, the legitimate explanation for that termination, the evidence that the termination was

anticipated long before the disclosures, and the lack of any additional circumstantial or other

evidence linking the disclosures to the termination, Plaintiff simply cannot satisfy the substantial

showing of a "direct causal link" required for relief under the DCWPA.  His suspicions of an

improper coincidence must succumb to this strong tide of legitimate justifications and the

chronology of events.  See McCormick v. District of Columbia, 752 F.3d 980, 985-86 (D.C. Cir.

2014) ("[W]e cannot conclude that the plaintiff has provided evidence of causation sufficient to

survive summary judgment" where there was a ten-month lapse between protected disclosures

and termination and where plaintiff could provide no "circumstantial or other evidence of

retaliatory causation."); see also Mentzer, 677 F. Supp. 2d at 257 (granting summary judgment to

Defendant on DCWPA claim where plaintiffs "fail[ed] to identify a chain of specific actions to

temporally connect their protected activities to their adverse actions").  As such, the Court

concludes that WASA is entitled to summary judgment on Plaintiff's DCWPA claim based on its

alternative theory as well.

D.  Count III: D.C. Family and Medical Leave Act

WASA also moves for summary judgment on Count III, which alleges violations of the D.C. Family and Medical Leave Act.  "The DCFMLA was designed to ensure job security and health benefits to an employee during a temporary period of absence resulting from a . . . serious health condition."  Chang v. Institute for Public-Private Partnerships, Inc., 846 A.2d 318, 326 (D.C. 2004) (quotation marks omitted) (citing legislative history).  "Like its federal counterpart, the DCFMLA recognizes two theories for recovery – the retaliation or discrimination theory and the entitlement or interference theory."  Washington Convention Ctr. Auth. v. Johnson, 953 A.2d 1064, 1075-76 (D.C. 2008) (quotation marks and citation omitted); see also D.C. Code § 32-507(b)(1) (retaliation); id. § 32-507(a) (interference).  Although his briefing is a bit unclear on this point, Plaintiff appears to advance both.

To make out a *prima facie* case under an interference or entitlement theory, a plaintiff would need to establish that his employer "interfere[d] with, restrain[ed], or den[ied] the exercise of or the attempt to exercise any right" afforded him by the DCFMLA.  Washington Convention Ctr. Auth., 953 A.2d at 1076 (quoting D.C. Code § 32-507(a)).  If an employer interferes with an employee's substantive rights under the statute, such as his rights to medical leave or to reinstatement following such leave, "a deprivation of this right is a violation regardless of the employer's intent."  Id. at 1076 (quotation marks and citation omitted).  The interference theory may entitle a plaintiff to relief where an employer has violated the DCFMLA mandate that "an employee returning from medical leave will be restored to the same position which that employee held when the leave began, or to an equivalent position."  Harrison v. Children's Nat'l Med. Ctr., 678 A.2d 572, 575 (D.C. 1996); see also D.C. Code § 32–505(d).  It bears noting, however, that the DCFMLA "simply does not force an employer to retain an employee [who is]

on FMLA leave when the employer would not have retained the employee had the employee not

been on FMLA leave." Washington Convention Ctr. Auth., 953 A.2d at 1077 (citation omitted).

To establish a *prima facie* case under a retaliation or discrimination theory, conversely,

"a plaintiff must demonstrate that: (1) she was engaged in a protected activity; (2) her employer

took an adverse employment action; and (3) there was a causal connection between the two."

Chang, 846 A.2d at 329; see also Alford v. Providence Hosp., 945 F. Supp. 2d 98, 108 (D.D.C.

2013) (same). "[T]aking FMLA leave constitutes a 'protected activity,' [and] termination

constitutes an 'adverse employment decision.'" Chang, 846 A.2d at 329 (citation omitted).

Under this theory, "'a plaintiff bears the initial burden of producing evidence to sustain a *prima*

*facie* case. If the plaintiff meets this burden, the employer must then produce evidence of a

legitimate, nondiscriminatory reason for his action. If the employer offers [such a] reason, the

burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is

pretextual.'" Id. (citation omitted) (applying burden-shifting framework from McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973), to DCFMLA claims).

Defendant urges the Court to grant it judgment on Harris's DCFMLA claim because, it

contends, he cannot satisfy the threshold requirement common to both theories of relief –

namely, that he took DCFMLA leave. See Mot. at 12-13. Oddly, Harris does not directly

contest WASA's position that his leave was not covered by the statute; his Opposition, instead,

simply seems to take for granted that he took DCFMLA leave before being fired. See Opp. at

32-33. Indeed, the brief merely repeats, without supporting evidence or analysis, his belief that

his "rights under the Family and Medical Leave Act" were violated. See id. at 32. Even if he

had contested the issue, the Court believes Harris has not cleared the DCFMLA's most basic

hurdle.

To avail himself of the protections of the FMLA, an employee must specifically take

FMLA leave; naturally, all absences from work and all types of leave are not covered. The D.C.

Court of Appeals has explained:

> Subject to some limitations, . . . leave may be taken intermittently when medically necessary. . . . However, the employee must request such leave. Under the applicable regulations, employees must notify their employers of their desire to take medical leave (1) as soon as possible prior to the date on which the employee wishes the leave to begin when the need for leave was not reasonably foreseeable at least thirty days in advance, or (2) not later than two [] business days after the absence begins if an emergency prevents an employee from notifying the employer of the need for [family or] medical leave prior to the first day of absence.

Hamilton v. Howard Univ., 960 A.2d 308, 316-17 (D.C. 2008) (quotation marks and citations

omitted). The DCFMLA provides, furthermore, that employers "may require" that a request for

leave under the statute "be supported by a certification issued by the health care provider of the

employee." D.C. Code § 32-504(a); see also id. § 32-504(b) ("The certification . . . shall state:

(1) The date on which the serious health condition commenced; (2) The probable duration of the

condition; (3) The appropriate medical facts within the knowledge of the health care provider

that would entitle the employee to take leave under this chapter; and (4) . . . a statement that the

employee is unable to perform the functions of the employee's position."). The statute's

implementing regulations clarify that an employee "shall submit the requested certification to the

employer within fifteen days, unless it is not practicable for the employee to do so under the

particular circumstances, despite the employee's diligent, good-faith efforts." 4 D.C. Mun. Regs.

§ 1615.2.

WASA has provided the Court with Harris's Leave Request Form, dated October 5, 2011

– 8 days before he was notified of the RIF – in which he requests "Annual Leave" for sixteen

hours. See Green Decl., Exh. 5. The form asks employees to identify the type of leave requested

and instructs them to fill out a separate section of the form if they wish to take "AUTHORIZED

FAMILY AND MEDICAL LEAVE ACT (FMLA)" leave, which includes a box where

employees may indicate, "I am requesting Authorized FMLA." Id.  The form further states that

"FMLA Application and Certification of Health Care Provider must accompany this request."

Id.

Plaintiff does not deny that he selected "Annual Leave" instead of "FMLA leave" and

that he did not check the box affirmatively declaring that he was requesting FMLA leave.  Nor

does he produce any other Leave Request Form covering the period of his absence from work on

which such box is checked.  He states only that he took "approved leave for medical purposes,"

Opp. at 33, but not that he officially designated that leave as FMLA leave or requested that it be

considered as such.  While his Opposition mentions in passing that he was on leave "to enter the

hospital for an in-patient surgery," id., it identifies no documentation suggesting that a medical

procedure – or any other serious medical condition – was the reason for his absence.   As

Defendant aptly notes, "There is no evidence whatsoever to suggest that Plaintiff notified DC

Water, or that DC Water was aware, that Plaintiff needed leave for medical reasons" when he

filed his October 2011 Leave Request form.  See Mot. at 13.

Harris also does not dispute that WASA exercised its right under the DCFMLA and

related regulations to require medical certification before authorizing leave under the statute.  He

does not argue that he did, in fact, provide such certification for his DCFMLA leave or that he

made "diligent, good-faith efforts" to do so.  Nor, indeed, do any of the materials in the record

lend credence to the notion that either is true.  The only possibly relevant evidence Harris

presents on this issue is a portion of his deposition testimony in which he states that he took "like

three days" of FMLA leave in October 2011 but makes no mention of the required medical

certification or leave request form.  See Harris Dep. at 136:13-16.  Indeed, in response to

Defendant's position that he "took annual leave without designating it as sick leave or FMLA

leave," SMF, ¶ 10, Harris stated that he "does not dispute that Plaintiff used annual leave for a

scheduled in-patient surgery."  Pl. Resp. to SMF, ¶ 10.

      In short, Plaintiff's submissions do not establish that he actually took DCFMLA leave or

provided the necessary certification required by WASA employees when requesting it.  Nor does

Harris dispute that his failure to provide the certification requested by his employer is an

impediment to recovery here.  As such, the Court must agree with Defendant that Harris did not

carry his burden to prove a question of material fact existed as to whether his absence from work

in October 2011 was protected by the DCFMLA.  This means that Harris cannot establish that

WASA interfered with, restrained, or denied the exercise of any rights provided by the

DCFMLA, see Washington Convention Ctr. Auth, 953 A.2d at 1075, nor that he was engaged in

"protected activity" under the statute when he was fired.  See Chang, 846 A.2d at 329.  Without

the protected leave that forms the foundation of any theory of relief afforded by the DCFMLA,

Harris's claim evaporates.

      E.  Remaining Arguments

      Although the foregoing analysis is sufficient to grant Defendant summary judgment on

these causes of action, the Court briefly addresses a tangential issue that occupies a significant

portion of Harris's briefing.  He argues at length in his Opposition that WASA did not follow its

own reduction-in-force procedures, implying that its termination of his position by RIF was

pretextual.  See Opp. at 29.  This argument, however, takes Plaintiff nowhere for two reasons:

First, a showing of pretext is required only at the third step in the McDonnell Douglas burden-

shifting framework that governs retaliation claims under the DCFMLA.  As previously

explained, a plaintiff must first make out a *prima facie* case, then the defendant must provide evidence of a legitimate reason for the adverse employment action, and only then should a plaintiff provide evidence of pretext.  See Chang, 846 A.2d at 329.  Harris's claim fails at step one, making any discussion of a pretextual RIF irrelevant.

The same goes for his DCWPA claim.  "In order to survive a summary judgment motion under the McDonnell Douglas framework as applied to the District of Columbia whistleblower statute, a plaintiff must challenge the motion for summary judgment with a proffer of admissible evidence that his protected activity was a contributing factor in his adverse employment actions." McCormick, 752 F.3d at 985 (quotation marks, citation, and alterations omitted).  Then, "the presentation of a *prima facie* case shifts the burden of proof to a defendant employer," but where a plaintiff "has not established a *prima facie* case, . . . the burden does not shift."  Id.  As to Harris's DCWPA claim, therefore, any discussion of a pretextual RIF would also be jumping the gun.[1]

Second, the regulations that Harris contends that WASA failed to follow concern rehiring, not firing.  See Opp. at 29-30 ("Harris had priority reemployment rights. . . [but] WASA was able to accomplish its scheme of denying Mr. Harris his employment rights by

_____

[1] Unlike federal Title VII claims, which require the Court to consider the *prima facie* case alongside questions of pretext in a holistic fashion at the summary-judgment stage, the DCWPA and DCFMLA permit a court to grant an employer summary judgment where the plaintiff fails to satisfy the elements of his *prima facie* case.  Compare Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) ("In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not and should not decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas" at summary judgment.), with Coleman v. District of Columbia, 794 F.3d 49, 54, 62 (D.C. Cir. 2015) (explaining that DCWPA "prescribes a distinct burden-shifting framework to govern the proof of whistleblowing claims" that differs from Title VII); see also Butler v. D.C. Hous. Fin. Agency, 593 F. Supp. 2d 61, 65 n.9 (D.D.C. 2009) ("No court has decided yet whether Brady . . . applies to claims under FMLA or DCFMLA."); but see Miles v. Howard Univ., 83 F. Supp. 3d 105, 121 (D.D.C. 2015) (implying, without analysis, that Brady applies to DCFMLA claims).

failing and refusing to notify him of any vacant positions in Maintenance."). In essence, then, his argument relates to the agency's supposed violation of his reemployment rights – an issue entirely separate from his claim that he was <u>terminated</u> for taking family or medical leave or blowing the whistle. If WASA did fail to follow the District's applicable rehiring regulations – a question the Court has no need to answer – there may be administrative or statutory remedies available to Plaintiff. The DCFMLA and the DCWPA, however, provide no relief for that failure. WASA is entitled to judgment on Harris's D.C. statutory claims, and the Court will so rule.

## IV.    Conclusion

Although Plaintiff may subscribe to W.C. Fields's dictum that "You can't trust water: Even a straight stick turns crooked in it," the Court cannot agree that WASA has acted crookedly here. It will, accordingly, issue an Order granting Defendant's Motion for Summary Judgment as to Count I in part and Count III in full. As Count II has already been dismissed, all that remains of this action is Plaintiff's common-law wrongful-termination claim set forth in Count I.


/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: <u>March 28, 2016</u>